UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| MICHAEL JOHNSON, ) | |
| ) | |
| Plaintiff, ) | Case No. 3:06-1178 |
| ) | Judge Trauger |
| v. ) | |
| ) | |
| THE METROPOLITAN GOVERNMENT OF ) | |
| NASHVILLE, DAVIDSON COUNTY, and ) | |
| OFFICER JOHN STORMENT, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM

This case comes before the court on a Motion to Dismiss filed by the defendants (Docket No. 19), to which the plaintiff has responded (Docket No. 20), and the defendants have replied (Docket No. 22). For the reasons cited herein, the defendant's Motion to Dismiss will be **GRANTED**.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The plaintiff, Michael Johnson, was shot by an assailant inside his Chrysler Pacifica after attempting to keep the assailant from entering his car.[1] On November 11, 2005, at approximately 10:30 p.m., Mr. Johnson's Chrysler Pacifica was stolen from the parking lot of a QuickSak market in Antioch, Tennessee. Mr. Johnson was inside the Quicksak when the car was stolen. He immediately reported the theft to the local authorities.

Mr. Johnson spent the next morning searching for his car in local apartment complexes.

---

[1] Unless otherwise indicated, the facts have been drawn from the plaintiff's Complaint (Docket No. 1, Ex. Complaint).

1

That his car might be found in a local apartment complex, rather than in a chop-shop or a more distant location, was apparently a good hunch, for Mr. Johnson located his car by noon of November 12, 2005, backed into a parking space at the Apache Trail apartment complex. Mr. Johnson knew that it was his Chrysler Pacifica by checking the license plate and by the fact that his personal belongings, previously located inside the car, were now located on a hill near the car.

Mr. Johnson retreated 100 yards and called his wife, LaGene Johnson, requesting that she first call the police and then drive to the Apache Trail parking lot along with Mr. Johnson's father, Sammy Lowe. Mr. Johnson planned for Mr. Lowe to drive home in the car that Mr. Johnson had been utilizing for his search. Mr. Johnson would then drive home in the recovered Chrysler Pacifica.

Mrs. Johnson called 911, reported that her husband had recovered a stolen car, and asked whether he could remove it from the parking lot. The operator told her that, if they removed the car, they might be stopped at gunpoint and arrested for driving a stolen car. Mrs. Johnson passed this information on to her husband.

Soon thereafter, Mrs. Johnson and Mr. Lowe arrived at the parking lot where they waited, along with Mr. Johnson, for the police, staying approximately 100 yards from the car. The police arrived at 1:45 p.m., in the form of Officer John Storment. Officer Storment examined the car, wrote a police report, then informed Mr. Johnson and Mr. Lowe that he would be leaving soon, as his shift was ending. Mr. Johnson asked Officer Storment if he could take the car. Officer Storment said that, if Mr. Johnson wanted to prosecute the men who had stolen the car, he would have to wait for additional officers, who would dust the car for fingerprints before

driving it away.  Otherwise the police would not investigate the theft.

Mr. Johnson asked Officer Storment if it would be safe to remain in the parking lot with the stolen car.  Officer Storment repeated that, if he wished to prosecute the car thieves, he would have to remain at the parking lot.  Mr. Johnson asked Officer Storment if he would remain with him until the other officers arrived.  Officer Storment did not respond, but instead walked to his patrol car and sat in it for a period of time.  Then Officer Storment drove away.

Within several minutes of Officer Storment's departure, three men drove into the parking lot in a red Honda Civic.  Mr. Johnson stood next to his car.  One of the three men walked very quickly towards Mr. Johnson and the Chrysler Pacifica.  As this man attempted to enter the car, Mr. Johnson blocked the car door with his hand.  The man pulled Mr. Johnson into the car and, inside the car, Mr. Johnson and the assailant wrestled.  The result of this struggle was that Mr. Johnson was shot in his left hand, his right knee, and his left hip.  The assailant escaped.  Mrs. Johnson called 911 a second time, and medical personnel took Mr. Johnson to the hospital.

Eventually Mr. Johnson's car was returned to him, still containing his bloody clothes.  Presumably the defendants have conducted an investigation of the matter, inasmuch as Mr. Johnson himself has been given a lie-detector test about the incident.  However, when Mr. Johnson has asked about the status of the investigation, he alleges that the police have implied that he should know the status, because he knows who shot him, and given him no further information.

The plaintiff filed this action on November 13, 2006, in the Circuit Court of Davidson County, Tennessee, alleging (1) violation of Mr. Johnson's 14th Amendment substantive due process rights to personal security and bodily integrity under 42 U.S.C. § 1983, against Officer

3

Case 3:06-cv-01178    Document 23    Filed 08/30/07    Page 3 of 16 PageID #: 82

Storment; (2) violation of Mr. Johnson's 14th Amendment substantive due process rights to personal security and bodily integrity through implementation of a custom, practice, or policy under § 1983, against the Metropolitan Government of Nashville ("Metro") and Davidson County; and (3) negligence under the Tennessee Governmental Tort Liability Act, against defendant Metro. (Docket No. 1, Ex. Complaint) On December 12, 2006, defendant Metro removed the case to this court pursuant to 28 U.S.C. § 1441. (Docket No. 1) On May 3, 2007, defendant Metro filed a Motion for Judgment on the Pleadings on the plaintiff's negligence claim under the Tennessee Governmental Tort Liability Act. (Docket No. 17) The plaintiff did not oppose this motion and it was granted on May 29, 2007. (Docket No. 18) On June 6, 2007, all three defendants filed a motion to dismiss the remaining claims.

## ANALYSIS

### I. Motion to Dismiss Standard

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will accept as true the facts as the plaintiff has pleaded them. *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002); *Performance Contracting, Inc. v. Seaboard Surety Co.*, 163 F.3d 366, 369 (6th Cir. 1998). The Federal Rules of Civil Procedure require only that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). "Indeed it may appear on the face of the pleadings that recovery is very

4

remote and unlikely but that is not the test." *Scheuer*, 416 U.S. at 236. Rather, challenges to the merits of a plaintiff's claim should be "dealt with through summary judgment under Rule 56." *Swierkiewicz*, 534 U.S. at 514.

This term, in *Bell Atl. Corp. v. Twombly*, --- U.S. ----, 127 S.Ct. 1955, 1964-65 (2007), the Supreme Court readdressed the pleading requirements under the Federal Rules. Specifically, the Court reconsidered the long-held dictum that "'a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Id.* at 1968 (quoting *Conley*, 355 U.S. at 45-46). The court rejected a literal reading of the "no set of facts" rule, under which "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." *Id.* Instead, the court stressed that, although a complaint need not plead "detailed factual allegations," those allegations "must be enough to raise a right to relief above the speculative level." *Id.* at 1964-65. Further, the Court observed that Federal Rule of Civil Procedure 8(a)(2) does require a "showing" that the plaintiff is entitled to relief and that this substantive threshold is not achieved by conclusory assertions. *Id.* at 1965 n. 3. Accordingly, the Court concluded that the "no set of facts" language, "after puzzling the profession for 50 years . . . has earned its retirement." *Id*. at 1969. "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.*[2]

---

[2] Recently, in *Lindsay v. Yates*, --- F.3d ----, 2007 WL 2316626, at *4 n. 6 (6th Cir. Aug. 15, 2007), the Sixth Circuit reaffirmed that, in the wake of *Twombly*, Rule 8(a) still "requires only a short and plain statement of the claim showing that the pleader is entitled to relief."

5

Although Federal Rule of Civil Procedure 8 establishes a "liberal system of notice pleading," *E.E.O.C. v. J.H. Routh Packing Co.*, 246 F.3d 850, 851 (6th Cir. 2001), "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombley*, 127 S.Ct. at 1964-65 (citing *Papasan v. Allain,* 478 U.S. 265, 286 (1986). Accordingly, to survive a motion to dismiss, "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id*. at 1965; *see also*, *Swierkiewicz,* 534 U.S. at 508, n. 1; *Neitzke v. Williams,* 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer,* 416 U.S. at 236 (a well-pleaded complaint may proceed, even if it appears "that a recovery is very remote and unlikely"). With this standard in mind, the court turns to an analysis of the plaintiff's claims.

## II. Deprivation of Rights Under § 1983

---

(quoting *Erikson v. Pardus*, --- U.S. ----, 127 S.Ct. 2197 (2007)). Even more recently, in *Weisbarth v. Gaeauga Park Dist.*, No. 06-419, --- F.3d ----, 2007 WL 2403659, at *3 (6th Cir. Aug. 24, 2007), the Sixth Circuit discussed *Twombly*'s ultimate effect on the 12(b)(6) pleading standard, favorably noting the Second Circuit's reasoning in *Iqbal v. Hasty*, No. 05-5768-CV, --- F.3d ----, 2007 WL 1717803, at *11 (2d Cir. Jun. 14, 2007), that *Twombly* did not require "a universal standard of heightened fact pleading, but . . . instead requir[ed] a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations . . . to render the claim *plausible*." (emphasis in original). However, the court in *Weisbarth* also stated that, because the disposition of that case did not "depend upon the nuances of *Twombly*'s effect on the dismissal standard," that it "need not resolve the scope of that decision here." *Id*. Similarly, for reasons to be discussed *infra*, the court need not resolve the specific factual requirements for pleadings established by *Twombly*. The fault in the plaintiff's Complaint lies not in its failure to underpin his allegations with plausible facts, but in the failure of those allegations, as a matter of law, to state a viable claim for relief.

To properly plead a claim under 42 U.S.C. § 1983, the plaintiff must allege that the defendants (1) acted under color of state law, and thereby (2) deprived the plaintiff of a right provided by the United States Constitution. *Upsher v. Grosse Pointe Pub. Sch. Sys.*, 285 F.3d 448, 452 (6th Cir. 2002); *Brooks v. Knapp*, 221 Fed. Appx. 402, 405 (6th Cir. 2007). There is no dispute in this case that Officer Storment, to the extent that he "acted," did so under color of state law. However, the plaintiff's allegations are insufficient, as a matter of law, to demonstrate that Officer Storment deprived him of any substantive due process rights.

In *Deshaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 198 (1989), the Supreme Court held that the Due Process Clause generally does not impose affirmative duties on the state to protect the interests of individuals. In finding that state officials were not liable for injuries resulting from violent acts committed by third parties, the Court reasoned that "our cases have recognized that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id*.

The Court in *Deshaney* recognized one exception to this rule and provided a window—which the Sixth Circuit, along with many other courts of appeals, has subsequently opened—for another. Under the first *Deshaney* exception, "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id*. at 199-200. That is, the state has a duty to protect an individual by dint of a special relationship which "only arises 'when the state restrains an individual.'" *Cartwright v. City of Marine City*, 336 F.3d 487, 492 (quoting *Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 911 (6th Cir. 1995) (holding that no

7

affirmative duty to protect arose between a child who died of heart failure on a school bus and the school district, notwithstanding that school attendance was compulsory by law)).

In *Deshaney*, the Court created the possibility of another avenue for relief when it stated that, "[w]hile the State may have been aware of the dangers that [the plaintiff] faced in the free world, *it played no part in their creation, nor did it do anything to render him any more vulnerable to them.*" *Deshaney*, 489 U.S. at 201 (emphasis added). In *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998), the Sixth Circuit followed a number of other Circuits in interpreting this language to support a state-created danger theory of liability in § 1983 actions. Under *Kallstrom*, "while the state generally does not shoulder an affirmative duty to protect its citizens from private acts of violence, it may not cause or greatly increase the risk of harm to its citizens without due process of law through its own affirmative acts." *Id.*; *see also Kneipp v. Tedder*, 95 F.3d 1199, 1205 (3d Cir. 1996); *Uhlrig v. Harder*, 64 F.3d 567, 572 n. 7 (10th Cir. 1995); *Dwares v. City of New York*, 985 F.2d 94, 99 (2d Cir. 1993); *Reed v. Gardner*, 986 F.2d 1122, 1125 (7th Cir. 1993), *cert. denied*, 510 U.S. 947 (1993); *Freeman v. Ferguson*, 911 F.2d 52, 55 (8th Cir. 1990). Liability under the "state-created danger" theory "is predicated upon affirmative acts by the state which either create or increase the risk that an individual will be exposed to private acts of violence." *Kallstrom*, 136 F.3d at 1066.

### A. Custodial Relationship

The Sixth Circuit has held that the custodial relationship exception applies only "when the state restrains an individual." *Cartwright*, 336 F.3d at 492 (quoting *Sargi*, 70 F.3d at 911 (6th Cir. 1995). Because the allegations in the complaint are inconsistent with any characterization that Officer Storment restrained the plaintiff, no custodial relationship can exist

8

in this case as a matter of law.

The plaintiff relies on language in the Sixth Circuit's *Davis v. Brady* opinion, 143 F.3d 1021, 1025 (6th Cir. 1998), for the proposition that liability may attach under the custodial relationship exception, even where the plaintiff has not been placed in custody. However, in *Davis*, the court merely stated that "a duty to protect can arise in a noncustodial setting if the state does anything to render an individual more vulnerable to danger." *Id*. That is, the *Davis* opinion anticipated the possibility of liability under the *second* exception to the general rule that the state is not liable for wrongs committed by private parties. That exception, which the Sixth Circuit has often discussed, but only applied in *Kallstrom*, 136 F.3d at 1066, will be analyzed below.

*Davis v. Brady* did not widen the scope of the custodial exception. Instead, the court in *Davis* held that the custodial exception applied only because police officers took the plaintiff into custody. *Id*. at 1024-25. In *Davis*, the plaintiff, Steverson Davis, was arrested by two police officers for intoxication and disorderly conduct after consuming "a substantial amount of Thunderbird wine and a half-pint of vodka." *Id*. at 1023. Mr. Davis was actually taken to the county jail, which was full, then handcuffed and transported by squad car to a dangerous portion of a 55-mile-per-hour highway, where he was thrown out of the car, forced to the ground, called a "smart ass" and told to find his way back into the city. *Id*. Mr. Davis was subsequently hit by a car. *Id*. The court held that the state could be held liable for the actions of the officers only because "the defendant officers took the affirmative act of restraining Davis's freedom to act on his own behalf, and consequently imposed upon themselves a duty to ensure that they were not placing him in danger." *Id*. at 1024-25.

9

In contrast, the court in *Davis* discussed the prior case of *Foy v. City of Berea*, 58 F.3d 227, 228 (6th Cir. 1995), in which the plaintiff, who had been drinking in a dormitory with his friends, was told by a police officer to "Get in your car and get out of here or somebody is going to get arrested." The plaintiff in *Foy* had followed the officer's instruction and, forty-five minutes later, died in a car accident. *Id*. However, the court in *Foy* held that the custodial relationship exception did not apply and the plaintiff's estate had no right to relief, reasoning that "[t]he officers may have used bad judgment in telling [the plaintiff] to get in the car and leave, but this command was not an example of arbitrary exercise of the state's power." *Id*. at 231. Liability could not attach because "[n]either Foy nor Phillips was ever in custody." *Id*.

The court in *Davis* distinguished *Foy* on the grounds that, in *Foy*, "there was no restraint on [the plaintiff's] liberty that had caused him to take the trip that resulted in his death." *Davis*, 143 F.3d at 1025. In fact, the court went so far as to state that "[t]he distinguishing factor between *Foy* and this case is that the officers never took the men in *Foy* into custody and, therefore, never assumed a duty to provide for their safety." *Id*. Far from holding that custody is not required in order for the custodial relationship exception to provide an avenue for relief, *Davis* stands strongly for the position that the exception does, in fact, require custody.[3] *Id.*; *see*

---

[3]The plaintiff also discussed *Stemler v. City of Florence*, 126 F.3d 856, 868 (6th Cir. 1997), in support of his contention that "state custody" can be extended to cases that do not actually involve confinement. However, the court in *Stemler* merely held that the plaintiff was "placed in the state's custody," where the plaintiff "was rendered unable to protect herself by virtue both of the threat of arrest and her physical placement in [her inebriated boyfriend's] truck by the officers." *Id*. The plaintiff "was in the custody of the defendant officers in the sense that they had affirmatively acted to deprive her of her liberty, rather than merely negligently refused to act to protect her." *Id*. Unlike the plaintiff in this case, who was free to stay in the parking lot with his car or depart, the plaintiff in *Stemler* actually suffered a deprivation of liberty and, therefore, *Stemler* does not depart in any way from the Sixth Circuit's other cases requiring actual state custody in order for the custodial relationship exception to apply.

10

Case 3:06-cv-01178   Document 23   Filed 08/30/07   Page 10 of 16 PageID #: 89

*also Cartwright*, 336 F.3d at 492 (holding that the custodial relationship exception did not apply where the plaintiff had accepted two police officers' offer for a ride, then declined to be taken further, because "he was never in custody"); *Koulta v. Merciez*, 477 F.3d 442, 445 (holding that the custodial relationship exception did not apply because "[t]he officers never placed Koulta in protective custody or otherwise restrained his liberty to the point where he could not take care of himself").

The plaintiff does not allege that he was ever taken into custody; nor does he allege any specific deprivations of liberty. Indeed, the allegations, on their face, demonstrate that Mr. Johnson was free to leave the Apache Trail parking lot—with or without his car—up until the point that his assailant pulled him into his car and shot him. Although the plaintiff has attempted to characterize Officer Storment's instructions as an "order" to remain at the scene of the crime, the factual allegations of the complaint belie this characterization. Instead, the complaint alleges that Officer Storment told Mr. Johnson that, if he wanted to prosecute the car thieves, he would have to stay at the scene of the crime. Then Officer Storment drove away. The complaint does not allege that Officer Storment told him that he had to remain at the parking lot under penalty of law. However, even if Officer Storment had issued such an order—and even threatened arrest—under *Foy*, that alone would not have been enough to demonstrate a special custodial relationship. *Foy*, 58 F.3d at 231. It is inconceivable how Officer Storment could have deprived the plaintiff of his personal liberty to move freely, while simultaneously driving away from the parking lot at the end of his shift. The allegations are inconsistent, as a matter of law, with the plaintiff's contention that he was placed under state custody during his ordeal at the Apache Trail.

11

## B. State-Created Danger

A plaintiff who has not been placed in state custody may nevertheless pursue the state under the state-created danger exception. Under that exception, "[w]hen the State 'cause[s] or greatly increase[s] the risk of harm to its citizens . . . through its own affirmative acts,' it has established a 'special danger' and a corresponding duty to protect its citizens from that risk.'" *Koulta*, 477 F.3d at 445 (quoting *Kallstrom*, 136 F.3d at 1066). Accordingly, a plaintiff seeking to state a claim under the state-created danger exception must allege three things: "(1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff." *Id*. (quoting *Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006).

The plaintiff's complaint fails to properly allege the first requirement: an affirmative act by the state that created or increased his risk of harm. While *Kallstrom* remains the only case in which the Sixth Circuit has actually held that the first requirement was met, the Sixth Circuit has, on numerous occasions, rejected claims because "the challenged conduct either was not an affirmative act at all or did not create or increase the risk of private violence to the plaintiff." *McQueen v. Beecher*, 433 F.3d 460, 465 (6th Cir. 2006) (citing *Shroder v. City of Fort Thomas*, 412 F.3d 724, 728-29 (6th Cir. 2005) (holding that the city's and officials' creation of a street and the management of traffic conditions did not satisfy the requirement); (*Cartwright*; 336 F.3d at 493 (holding that the police's transport of the plaintiff from a place of greater danger to a place

12

of lesser danger did not satisfy the requirement); *Bukowski v. City of Akron*, 326 F.3d 702, 710 (6th Cir. 2003) (holding that the police officers' return of the plaintiff to the home of a man who subsequently raped her—which is where the officers initially found her and where she requested to be returned—did not satisfy the requirement); *Sargi*, 70 F.3d at 911 (holding that the school board's failure to adequately respond to a child's medical emergency on a school bus did not satisfy the first requirement)).

Whether Officer Storment's statements to the plaintiff and his departure constituted "affirmative conduct" is a difficult question; fortunately it is not the relevant inquiry. The Sixth Circuit has held that the relevant question is not whether the officer "acted" or not, but whether his conduct, taken as a whole, created or increased the risk that the plaintiff would be harmed. *See Koulta*, 477 F.3d at 446 ("Rather than focusing on the often metaphysical question of whether officer behavior amounts to affirmative conduct or not, we have focused on 'whether [the victim] was safer before the state action than he was after it.'") (quoting *Cartwright*, 336 F.3d at 493). Further, the question "is not whether the victim was safer *during* the state action, but whether he was safer *before* the state action than he was *afterwards*." *Cartwright*, 336 F.3d at 493 (emphasis in original). Examining the allegations regarding Officer Storment's actions—particularly in comparison to the state conduct in prior Sixth Circuit decisions—the court finds that they do not properly allege that Officer Storment created or increased the plaintiff's risk of harm.

In *McQueen v. Beecher*, 433 F.3d at 463, the defendant left a group of elementary students alone in a classroom with another student, Smith, who had attacked other children on several earlier occasions. During the period in which the children remained unsupervised, Smith

13

shot several of his classmates. *Id*. The court held that the teacher's departure "was not an affirmative act that created or increased the risk" that the children would be harmed. *Id*. at 466.

The court in *McQueen* reasoned that "[t]he cases most applicable to the situation here are those in which the state officials performed some act, but we held that there was no affirmative act that created or increased the risk because the victim would have been in about the same or even greater danger if the state official had done nothing." *Id*. As in those cases, the court held that the danger to the plaintiff "was created by Smith's possession of a gun and [the plaintiff's] presence in the classroom with him." *Id*. That danger "existed irrespective of [the teacher's] location" because, after all, if she had "been in the room, there is no guarantee that, upon seeing the gun, she would have gotten to Smith in time to prevent the shooting." *Id*. Accordingly, the court found that the teacher had not committed an affirmative act to satisfy the first requirement of the state-created danger exception. *Id*.; *see also Weeks v. Portage County Executive Offices*, 235 F.3d 275, 279 (6th Cir. 2000) (holding that the officer's order to the decedent, who exhibited serious injuries, to "move along," after which the decedent was beaten to death by an assailant, was not an "affirmative act" which put the decedent in a more vulnerable position than he would have been in otherwise); *Deshaney*, 489 U.S. at 201 ("That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been in had it not acted at all.")

Excepting as true the facts as the plaintiff has pleaded them, Officer Storment could not have created or increased the plaintiff's risk of injury. The danger in this case, as in *McQueen*, was created by the assailant—and secondarily, by the plaintiff's resistance to the assailant—and

14

not by Officer Storment.  Had Officer Storment not arrived in the parking lot, it is equally plausible that Mr. Johnson's assailant would have arrived when he did and approached the car to enter it.  Because the plaintiff does not allege that Officer Storment instructed him to bar entry to his car, it is also equally plausible that Mr. Johnson would have attempted to protect his property and would have been shot in the process.  The plaintiff may have been safer while Officer Storment was in the parking lot than he was after Officer Storment departed, but the Sixth Circuit has held that this is not the relevant comparison.  *See Cartwright*, 336 F.3d at 493.  The question is whether the plaintiff was safer *before* the state action than he was *afterwards*.  *Id*.  The plaintiff's allegations simply do not answer this question in the affirmative.

The Sixth Circuit has instructed that, "[i]f the claimant . . . cannot identify conduct 'by the state which either created or increased the risk' of harm to which [the plaintiff] was exposed . . . our precedents instruct us to consider the officers' 'conduct as falling on the inaction side of the line.'" *Id*. (quoting *Jones*, 438 F.3d at 692).  The complaint does not allege conduct on the part of the state that increased Mr. Johnson's risk of being shot by his assailant.  Although Officer Storment's advice and subsequent retreat was perhaps ill-advised,  his role in the incident, as described in the complaint, did not increase the risk that Mr. Johnson would suffer injuries.  *See, e.g., Bukowski*, 326 F.3d at 705-06 (holding that when the police returned the plaintiff to the place of danger, they did not increase the risk of harm).  Under the facts as pled, had Officer Storment done nothing, Mr. Johnson would have been in no greater danger.  Accordingly, the state cannot be held liable for Mr. Johnson's injuries under the state-created danger exception.  The allegations in the plaintiff's complaint fail to state a claim for relief.

15

## **CONCLUSION**

For the reasons stated herein, the defendant's Motion to Dismiss (Docket No. 19) will be **GRANTED**.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

16